```
                         UNITED STATES DISTRICT COURT
                         SOUTHERN DISTRICT OF FLORIDA

                         CASE NO. 12-10105-Civ-MOORE
                               (11-10020-Cr-MOORE)
                         MAGISTRATE JUDGE P. A. WHITE
```

JUAN GONZALEZ CASTANEDA,           :

    Movant,                        :

v.                                 :        REPORT OF
                                            MAGISTRATE JUDGE
UNITED STATES OF AMERICA,          :

    Respondent.                    :
_____

## I. Introduction

This matter is before this Court on the movant's pro se motion to vacate pursuant to 28 U.S.C. §2255, attacking the constitutionality of his conviction following a guilty plea entered in Case No. 11-10012-Cr-Moore.

This Cause has been referred to the undersigned for consideration and report pursuant to 28 U.S.C. §636(b)(1)(B) and Rules 8 and 10 of the Rules Governing Section 2255 Cases in the United States District Courts.

The Court has reviewed the motion with attached exhibits and supporting memorandum of law (Cv-DE# 1, 4); the government's response to the motion (Cv-DE# 9); the movant's reply (Cv-DE# 10); the government's surreply with supporting exhibits (Cv-DE# 11); and all pertinent portions of the underlying criminal file.

## II. Claims

Movant is raising the following grounds for relief:

    1.    His conviction is unlawful, because the Maritime Drug Law Enforcement Act ("MDLEA") has been held unconstitutional by the Eleventh Circuit Court of

>   Appeals in United States v. Bellaizac-Hurtado, 700 F.3d 1245 (11th Cir. 2012).
>
> 2.  He is actually and factually innocent of the offense for which he was convicted based upon the unconstitutionality of the MDLEA in light of *Bellaizac-Hurtado*.
>
> 3.  He received ineffective assistance of trial counsel, because his lawyer failed to seek dismissal of the Indictment for the reasons asserted in *Bellaizac-Hurtado*.

### III. Factual Background and Procedural History

#### A. Facts of the Offense

On October 14, 2011, at 5:31 A.M., Coast Guard personnel aboard the USS CARR sighted the ANDREA I in international waters, traveling at approximately three knots. See Statement of United States Coast Guard Lieutenant Junior Grade Richard C. Guy Concerning the Boarding and Seizure of Motor Vessel (M/V) ANDREA 1 (Bolivia), 14-21 October 2011, at 1.[1] United States Coast Guard approached ANDREA I and commenced right of approach questioning to determine the vessel's nationality and purpose. Id. ANDREA I claimed to be Bolivian flagged and without cargo. Id. Coast Guard observed that the ANDREA I had a five to ten degree list to port, and rub marks on its hull consistent with having other vessels alongside for transfer of cargo at sea. Id. In addition, the vessel was not broadcasting on the Automated Identification System, as was required for a vessel of that size. Id. Due to the vessel's location, the responses, and physical condition of the vessel, the Coast Guard suspected the vessel to be engaged in illicit activity. Id.

Based on the registry claim of the ANDREA I, the United States

---

[1] A copy of the Statement of United States Coast Guard Lieutenant Junior Grade Richard C. Guy Concerning the Boarding and Seizure of Motor Vessel (M/V) ANDREA 1 (Bolivia), 14-21 October 2011 has been provided by the Government as Attachment A to its Surreply. (DE# 11-1).

enacted Article 17 of the 1988 United Nations Convention Against Illicit Traffic In Narcotic Drugs and Psychotropic Substances (1988) and contacted the Government of Bolivia to confirm registration and request authorization to board and search the vessel. See Certification for the Maritime Drug Law Enforcement Act Case Involving the Motor Vessel ANDREA I (Bolivia) executed by Commander Daniel Deptula, United States Coast Guard on November 14, 2011, at ¶4.a.[2] Pending Bolivia's response, the vessel continued to travel to its scheduled port of call, Colon, Panama. Id. At 8:50 P.M., before the United States received a response from Bolivia, the vessel entered Panamanian territorial waters. Id. at ¶4.b. See also Statement of United States Coast Guard Lieutenant Junior Grade Richard C. Guy Concerning the Boarding and Seizure of Motor Vessel (M/V) ANDREA 1 (Bolivia), 14-21 October 2011, at 1.

At 8:50 P.M., the USS CARR followed the ANDREA I from international waters into the territorial seas of Panama. Id. At 9:42 P.M., USS Carr entered Panamanian territorial seas in pursuit of ANDREA I. Id. At 10:45 P.M., United States Coast Guard was authorized to board and search the ANDREA I pursuant to the bilateral agreement between the governments of the United States and Panama. Id. See also Certification for the Maritime Drug Law Enforcement Act Case Involving the Motor Vessel ANDREA I (Bolivia) executed by Commander Daniel Deptula, United States Coast Guard on November 14, 2011, at ¶4.b.

Over the course of the next two days, United States Coast Guard boarded and searched ANDREA I and discovered approximately 20 bales, containing a total of 402 kilogram-sized packages, later

---

[2] A copy of the Certification for the Maritime Drug Law Enforcement Act Case Involving the Motor Vessel ANDREA I (Bolivia) executed by Commander Daniel Deptula, United States Coast Guard on November 14, 2011, has been provided by the Government as Attachment B to its Surreply. (DE# 11-2).

3

determined to be approximately 401 kilograms of cocaine. See Statement of United States Coast Guard Lieutenant Junior Grade Richard C. Guy at 2-8. On October 16, 2011, Movant and his crewmembers were transferred from ANDREA I to USS Carr as detainees. Id. at 7. Pursuant to Article XI of the Salas-Becker Agreement, the Government of the United States requested by diplomatic note that the Government of the Republic of Panama decline to exercise jurisdiction over the motor vessel ANDREA I, its cargo, and the eight Colombian crew members for the purpose of allowing enforcement of United States law by the United States. See Certification for the Maritime Drug Law Enforcement Act Case Involving the Motor Vessel ANDREA I (Bolivia) executed by Commander Daniel Deptula, United States Coast Guard on November 14, 2011, at ¶4.c. On October 25, 2011, the Government of the Republic of Panama notified the Government of the United States that it did not object to the United States's exercise of jurisdiction over the ANDREA I, its cargo, and the eight Colombian crew members, thereby consenting to the enforcement of United States law. Id.

Movant and his crew entered the United States at Key West, Florida on November 1, 2011. See Affidavit executed by Jose Irizarry, Special Agent, Drug Enforcement Administration, executed on November 2, 2011, at ¶8. (Cr-DE# 1). On that date, Special Agents with the United States Drug Enforcement Administration advised Movant and his fellow crew members in Spanish of their rights pursuant to *Miranda*.[3] Movant indicated that he understood those rights and agreed to waive his rights and speak to the special agents. Id.  Movant stated that he was the captain of the vessel and that he was to receive $125,000 to transport the cocaine from Colombia to Panama. Id. at ¶9. Movant further stated that a portion of the money was to be compensation for his services and

---

[3]Miranda v. Arizona, 387 U.S. 736 (1966).

4

the remainder was to pay the crew. Id. He additionally indicated that the crew had been advised that the purpose of the voyage was to transport cocaine and each willingly agreed to participate. Id. He also told the officers that while the ANDREA I was at sea, the cocaine was loaded onto the motor vessel from a smaller vessel, and that the crew assisted in the transferring of the cocaine. Id. The other crew members waived their rights pursuant to *Miranda* and similarly stated that they knew the purpose of the voyage was to transport cocaine, and learned so upon boarding the ANDREA I. Id. They admitted assisting in transferring the cocaine to the ANDREA I from a smaller vessel and did so several days before interdiction by the United States Coast Guard. Id.

### B. Indictment, Change of Plea and Sentencing

On November 10, 2011, an Indictment was returned charging Movant, along with seven others, with conspiring and possessing with the intent to distribute five or more kilograms of cocaine, while on board a vessel subject to the jurisdiction of the United States, in violation of 46 U.S.C. §§70506 and 70503 (Counts 1 and 2). See Indictment. (Cr-DE# 43). On November 15, 2011, former Secretary of State, Hillary Rodham Clinton, through her designee, issued a certification evidencing that on October 25, 2011, the government of Panama consented to the enforcement of United States law, by the United States over the ANDREA I, its cargo, and crew. See Department of State Certification.[4] On November 21, 2011, Movant entered pleas of not guilty to the crimes charged and the case proceeded to trial before a jury. (Cr-DE# 50).

On January 17, 2012, the day that trial was scheduled to commence, Movant entered into a negotiated written plea agreement

---

[4] A copy of the Department of State Certification executed on November 15, 2011, has been provided by the Government as Attachment B to its Surreply. (DE# 11-2).

with the government. See Plea Agreement. (Cr-DE# 83). Pursuant to the terms of the agreement, Movant agreed to change his plea of not guilty to guilty to the offense charged in Count 1 of the Indictment and the government agreed to dismiss Count 2. Id. On the same date that the plea agreement was executed, Movant executed a Stipulated Factual Proffer in which he stipulated and agreed that if the case had proceeded to trial, the government would have proven the following facts beyond a reasonable doubt:

1. On or about October 14, 2011, while on routine patrol in international waters off the Northern coast of Panama, the United States Coast Guard observed the Bolivian flagged motor vessel, *ANDREA I*, loitering in an area known for narcotics trafficking. Shortly thereafter, the United States Coast Guard observed the *ANDREA I* enter the territorial seas of Panama.

2. Pursuant to the 2002 Salas-Becker Agreement between the United States and the Republic of Panama, the United States Coast Guard pursued the *ANDREA I* into the territorial seas of Panama. Pursuant to Panama's authorization, that same day, the United States Coast Guard boarded the *ANDREA I*.

3. On board, the United States Coast Guard encountered the captain of the vessel, Juan Gonzalez Castaneda, and seven crew members, Edwin Garcia Alvarez, Luis Romero, Federico DeChamps Teran, Silfredo Hernandez, Primitivo Leon Zuniga, Edwar Barrios Berrio, and Pedro Miranda Camano.

4. The following day, upon searching the motor vessel, secreted within the bilge area, the United States Coast Guard discovered twenty-six bales, which tested positive for the presence of cocaine.

5. On October 26, 2011, Panama consented to the enforcement of United States law by the United States over the *ANDREA I*, its crew and cargo. Therefore, the *ANDREA I* was a vessel subject to the jurisdiction of the United States.

6. On November 1, 2011, the captain and crew of the *ANDREA I* entered the United States at Key West, Florida. The weight of the cocaine was determined to be 401 kilograms.

7. Post-*Miranda*, Gonzalez admitted to being the captain of the *ANDREA I* and that he was to be paid $125,000 to

6

>        transport cocaine from Colombia to Panama. Gonzalez
>        stated that the crew knew the purpose of the voyage,
>        that they were to be paid a portion of the money
>        received, and that they assisted in loading the cocaine
>        onto the *ANDREA I* from a smaller motor vessel at sea.

(Stipulated Factual Proffer)(Cr-DE# 84).

Also, on the same day, Movant appeared before the Court for change of plea proceedings. See Change of Plea Minutes. (Cr-DE# 85). The Court conducted a plea colloquy pursuant to Fed.R.Crim.P. 11 during which Movant was sworn. Id. The Court, being satisfied there was a factual basis for the plea, accepted the plea of guilty and found Movant guilty as charged as to Count 1 of the Indictment. Id. Movant was adjudicated guilty of the subject offense and sentence proceedings immediately followed where Movant was sentenced to a term of 168 months' incarceration to be followed by a five-year term of supervised release. See Sentencing Minutes; Judgment and Sentence. (Cr-DE# 104, 111).

Movant did not prosecute a direct appeal from his conviction or sentence. Approximately eleven months after judgment was entered, and one month after the Eleventh Circuit issued its opinion in *Bellaizac-Hurtado*, Movant submitted to this Court the instant pro se motion to vacate pursuant to 28 U.S.C. §2255.

## IV. Standard of Review

Pursuant to 28 U.S.C. §2255, a prisoner in federal custody may move the court which imposed sentence to vacate, set aside or correct the sentence if it was imposed in violation of federal constitutional or statutory law, was imposed without proper jurisdiction, is in excess of the maximum authorized by law, or is otherwise subject to collateral attack. 28 U.S.C. §2255. If a court finds a claim under Section 2255 to be valid, the court "shall vacate and set the judgment aside and shall discharge the prisoner or resentence him or grant a new trial or correct the sentence as

7

may appear appropriate." Id. To obtain this relief on collateral review, however, a petitioner must "clear a significantly higher hurdle than would exist on direct appeal." United States v. Frady, 456 U.S. 152, 166, 102 S.Ct. 1584, 71 L.Ed.2d 816 (1982)(rejecting the plain error standard as not sufficiently deferential to a final judgment).

Further, under Section 2255, unless "the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief," the court shall "grant a prompt hearing thereon, determine the issues and make findings of fact and conclusions of law with respect thereto." However, "if the record refutes the applicant's factual allegations or otherwise precludes habeas relief, a district court is not required to hold an evidentiary hearing." Schriro v. Landrigan, 550 U.S. 465, 474, 127 S.Ct. 1933, 167 L.Ed.2d 836 (2007). See also Aron v. United States, 291 F.3d 708, 715 (11th Cir. 2002)(explaining that no evidentiary hearing is needed when a petitioner's claims are "affirmatively contradicted by the record" or "patently frivolous"). An evidentiary hearing is not warranted in this case, because the motion and the files and records of the case conclusively show that Movant is entitled to no relief for the reasons expressed below. See Holmes v. United States, 876 F.2d 1545, 1553 (11th Cir. 1989), citing, Guerra v. United States, 588 F.2d 519, 520-21 (5th Cir. 1979).

## V. Discussion

Movant argues in claim one of his motion to vacate that his conviction is unlawful, because the MDLEA has been held unconstitutional by the Eleventh Circuit Court of Appeals in United States v. Bellaizac-Hurtado, 700 F.3d 1245 (11th Cir. 2012).[5] He

---

[5] It is noted that the Eleventh Circuit on March 4, 2013, denied the government's motion for rehearing en banc and issued its mandate soon thereafter. The government requested and was granted an extension of time up to July 3, 2013,

8

raises two additional related claims. Specifically, he alleges in ground two that he is actually and factually innocent of the offense for which he was convicted based upon the unconstitutionality of the MDLEA in light of *Bellaizac-Hurtado*. And, in ground three, he essentially alleges that his lawyer rendered ineffective assistance for failing to challenge the constitutionality of the MDLEA and its application to him. The gist of the government's argument in response is that Movant is not entitled to postconviction relief, because the facts of the instant care are identical to the facts addressed in cases that precede *Bellaizac-Hurtado* which have held that the MDLEA is a constitutional exercise of Congressional authority over drug trafficking aboard vessels transiting upon the high seas. According to the government, it is clear that the MDLEA is lawful exercise of Congressional authority under the Felonies Clause.

Movant was convicted of violating the MDLEA, 46 U.S.C. §70503(a), *et. seq*. The MDLEA is based on the constitutional authority granted to Congress "[t]o define and punish Piracies and Felonies committed on the high Seas, and Offences against the Law of Nations." U.S. Const., Art. I, §8, cl. 10. As explained by the Eleventh Circuit in *Bellaizac-Hurtado*, the Supreme Court has interpreted that Clause to contain three distinct grants of power: (1) the power to define and punish piracies (i.e., robbery on the high seas), (2) the power to define and punish felonies committed on the high seas, and (3) the power to define and punish offenses against the law of nations. See Bellaizac-Hurtado, 700 F.3d at 1248, *citing*, United States v. Smith, 18 U.S. (5 Wheat.) 153, 158–59, 5 L.Ed. 57 (1820). The first grant involves robbery on the high seas. Id., *citing*, United States v. Furlong, 18 U.S. (5 Wheat.) 184, 198, 5 L.Ed. 64 (1820). The second grant is the

---

to file a petition for writ of certiorari.

"Felonies Clause" or "High Seas Clause," which is limited to conduct on the high seas. Id., *citing*, U.S. Const., Art. I, §8, cl. 10. And, the third grant is the "Offences Clause," the grant implicated in *Bellaizac-Hurtado*. Id. at 148-49.

The question before the Eleventh Circuit in *Bellaizac-Hurtado* was whether Congress had the power under the Offences Clause to proscribe drug trafficking in the territorial waters of another nation, an issue of first impression in the Eleventh Circuit. Bellaizac-Hurtado, 700 F.3d at 1249-58. The court ultimately rejected the argument that the "Offences Clause" supported the MDLEA, stating "[b]ecause drug trafficking is not a violation of customary international law, we hold that Congress exceeded its power, under the Offences Clause, when it proscribed the defendants' conduct in the territorial waters of Panama." Id. at 1258. More specifically, the Eleventh Circuit reasoned that none of the three grants of power to Congress provided for by U.S. Const., Art. I., §8, cl.10. authorized Congress to define and punish drug-trafficking in the territorial waters of Panama because (1) drug-trafficking is not an act of piracy; (2) the offense was committed in the territorial waters of Panama, and not the high seas; and (3) drug-trafficking is not a violation of international law. Id. Therefore, as applied to drug-traffickers operating in the territorial waters of Panama, the Eleventh Circuit held the Act unconstitutional. Id.

The particular facts involved in *Bellaizac-Hurtado* were summarized by the appellate court as follows:

> During a routine patrol of Panamanian waters in 2010, the United States Coast Guard observed a wooden fishing vessel operating without lights and without a flag. The Coast Guard informed the Panamanian National Aero-Naval Service of the vessel. The Panamanian Navy pursued the vessel until its occupants abandoned the vessel and fled into a jungle. When members of the Panamanian Navy searched the vessel the next morning, they discovered approximately 760 kilograms of

10

>cocaine. The Panamanian National Frontier Service searched on land for the occupants of the abandoned vessel and arrested Bellaizac-Hurtado, Angulo-Rodallega, Gonzalez-Valois, and Riascos-Hurtado in various locations on the beach and in the jungle. After an exchange of diplomatic notes, the Foreign Ministry of the Republic of Panama consented to the prosecution of the four suspects in the United States.

Bellaizac-Hurtado, 700 F.3d at 1247-1248. The defendants were indicted in this Court with violating the MDLEA. See United States v. Bellaizac-Hurtado et al., No. 10-20196-Cr-King. The defendants subsequently moved to dismiss the indictment arguing that this Court lacked jurisdiction over the offense and that the MDLEA, as applied to their conduct, was unconstitutional. Id. at DE# 61, 67, 71, 75. The motions were denied, and the defendants subsequently entered guilty pleas and were adjudicated guilty of the offense of possession with intent to distribute cocaine on board a vessel subject to the jurisdiction of the United States in violation of 46 U.S.C. §70506(b). Id. at DE# 120, 175-178. On appeal from their convictions, the defendants argued that the MDLEA, as applied, exceeded the power of Congress under Article I, Section 8, Clause 10 of the United States Constitution. Bellaizac-Hurtado, supra.

The instant case is clearly distinguishable from *Bellaizac-Hurtado*. As stipulated to in the executed factual proffer, and as admitted to special agents with the United States Drug Enforcement Administration after having received and waived his *Miranda*-rights, Movant was the captain of a vessel transporting by sea cocaine from Colombia to Panama. Movant further admitted that, at the time that he was observed by the United States Coast Guard, the *ANDREA I* had been traveling in international waters before entering the territorial seas of Panama. The offense conduct here, at least in part, clearly took place in international waters, which is synonymous with the high seas. See United States v. Louisiana, 470 U.S. 93, 98-99 (1985)("Outside the territorial sea are the high seas, which are international waters not subject to

11

the dominion of any single nation."). Thus, unlike the situation involved in *Bellaizac-Hurtado*, Movant's vessel was unquestionably in international water rather than solely in another country's territorial water.

The fact that Movant's vessel ultimately entered Panamanian territorial waters and was interdicted inside the territorial waters of Panama does not extend the holding of *Bellaizac-Hurtado* to the instant case in that, as stated, the offense conduct here, conspiring to possess with the intent to distribute cocaine, was committed upon the high seas. The seizure, therefore, occurred under the second grant of power listed above—the power to define and punish a felony committed on the high seas. Movant's drug-trafficking conduct squarely falls under the Felonies Clause (i.e., High Seas Clause) and, as such, the MDLE is a valid exercise of Congress's power as held by long-standing Eleventh Circuit precedent.[6] Since the MDLEA, as applied in this case, does not exceed the power of Congress under Article I, Section 8, Clause 10, *Bellaizac-Hurtado* is inapplicable to Movant, as argued by the government.

Movant has filed a reply in which he opposes in several respects the arguments presented by the government. He first claims that his vessel was not in international waters, and could have entered Panamanian territorial waters from another country's coastline waters. He states that if the ANDREA I had truly been in international waters, the United States would have boarded it without first needing consent from Panama. He next takes issue with his executed stipulation, maintaining that there was no evidence to

---

[6]The Eleventh Circuit Court of Appeals, as well as other federal circuit courts, have consistently upheld Congress's power pursuant to U.S. CONST. art. I, §8, cl. 10 to enact the MDLEA and define and punish felonies committed on the high seas, which has particularly included drug trafficking offenses. See United States' Response to Movant's Motion to Vacate, Set Aside, Correct Sentence Pursuant to 28 U.S.C. §2255 at 6-8 and cases cited therein. (Cv-DE# 9).

support the stipulation that ANDREA I was in international waters in that there is no specific Coast Guard member identified in the stipulation as having observed the ANDREA I in international waters. Movant's arguments are unavailing.

Although the ANDREA I was in international waters, once the master indicated that the ANDREA I was with Bolivian nationality, the United States Coast Guard had no jurisdiction to board the vessel. To board a Bolivian flagged vessel upon the high seas, the United States is required to first obtain consent to board the vessel from the government of Bolivia. See United States v. Marino Garcia, 679 F.2d 1373, 1380 (11th Cir. 1982)(stating that "vessels are normally considered within the exclusive jurisdiction of the country whose flag they fly"). See also United States v. Reeh, 780 F.2d 1541, 1546 (11th Cir. 1986)(noting that "the boarding of a foreign vessel pursuant to the consent of the vessel's flag state is authorized by statute. Under 19 U.S.C. §§1581(h) and 1587(a), 'officers of the customs'—which includes Coast Guard officers, see 19 U.S.C. §1401(i)—are permitted to board and examine a foreign vessel 'under special arrangement' with the vessel's home government."). All nations may, however, assert jurisdiction over foreign vessels located within their territorial waters. Marino Garcia, 679 F.2d at 1380 n.11.

In this case, the United States first sought the consent of Bolivia to board the ANDREA I. See Certification for the Maritime Drug Law Enforcement Act Case Involving the Motor Vessel ANDREA I (Bolivia) executed by Commander Daniel Deptula, United States Coast Guard on November 14, 2011, at ¶4.a., b.; Statement of United States Coast Guard Lieutenant Junior Grade Richard C. Guy Concerning the Boarding and Seizure of Motor Vessel (M/V) ANDREA 1 (Bolivia), 14-21 October 2011, at 1-3. Before the government of Bolivia responded, however, the ANDREA I entered the territorial

13

seas of Panama. Id. Consent from the government of Panama to board the ANDREA I, the country then having jurisdiction over the foreign vessel was, therefore, next requested and was granted. Id. As opposed to indicating that the ANDREA I was not, at some point in time, in international waters, as Movant contends should be implied from the government's conduct, the actions taken by the United States in this case show that the United States was properly complying with all well-established bilateral agreements and treaties entered into between the governments of Bolivia and Panama and the Untied States. As aptly noted by the government, the only inference that can be drawn from the Coast Guard not boarding the ANDREA I while it was in international waters is that the United States did not obtain the consent of Bolivia to board the ANDREA I.

Movant next argues that no Coast Guard member has been identified as observing the ANDREA I in international waters. Such contention is clearly belied by the record. The United States Coast Guard's boarding report specifically states that the ANDREA I was initially encountered on the "High Seas" and the exact coordinates are provided. See Boarding Report at Part I prepared on October 14, 2011.[7] The complete 276-page Coast Guard Boarding Report was provided to Movant as a part of discovery. See Government's Response to the Standing Discovery Order at 4. (Cr-DE# 66). Further, as indicated above, Lieutenant Junior Grade Richard C. Guy expressly stated in his executed statement that on October 14, 2011, at 5:13 A.M., while on routine patrol in the Western Caribbean Sea, United States Coast Guard Law Enforcement Detachment sighted the ANDREA I "in international waters in position 10-07N, 077-47W on course 270T at speed of three knots" and that Coast Guard District Seven (D7) authorized USS CARR to pursue M/V ANDREA I into Panamanian territorial seas." (Statement of United States

---

[7] A copy of the Boarding Report Part I prepared on October 14, 2011, has been provided by the Government as Attachment C to its Surreply. (DE# 11-3).

Coast Guard Lieutenant Junior Grade Richard C. Guy Concerning the Boarding and Seizure of Motor Vessel (M/V) ANDREA 1 (Bolivia), 14-21 October 2011, at 1). The statement was part of the Coast Guard Boarding Report. Id. The facts contained in the Factual Proffer were based upon the facts provided by Coast Guard Junior Grade Richard C. Guy and United States Coast Guard Commander Daniel Deptula as well as Special Agent Jose Irizarry. Movant cannot in this postconviction proceeding now challenge those facts and retreat from his executed stipulation in which he unequivocally stipulated and agreed that the facts set forth therein would have been proven by the government beyond a reasonable doubt.

For the reasons indicated above, Movant's conduct squarely falls under the Felonies Clause of the United States Constitution, and the MDLEA, as applied to Movant, is constitutional.[8] Consequently, Movant is not entitled to the vacatur of his

---

[8]It is noted that the Eleventh Circuit in *Bellaizac-Hurtado* was careful to point out the following:

> [N]one of our earlier precedents about the extraterritorial application of our drug trafficking laws have answered the constitutional question presented in this appeal. Indeed, all of the appeals in which we have considered the constitutionality of those laws involved conduct on the high seas. *See, e.g.,* United States v. Ibarguen-Mosquera, 634 F.3d 1370, 1376-77 (11th Cir. 2011); United States v. Saac, 632 F.3d 1203, 1209 (11th Cir. 2011); United States v. Estupinan, 453 F.3d 1336, 1338-39 (11th Cir. 2006); United States v. Rendon, 354 F.3d 1320, 1322-23 (11th Cir. 2003); United States v. McPhee, 336 F.3d 1269, 1271-73 (11th Cir. 2003); United States v. Tinoco, 304 F.3d 1088, 1092-95 (11th Cir. 2002); United States v. Gonzalez, 776 F.2d 931, 933-34 (11th Cir. 1985); United States v. Romero-Galue, 757 F.2d 1147, 1149-51 (11th Cir. 1985); United States v. Marino-Garcia, 679 F.2d 1373, 1377-78 (11th Cir. 1982). Congress possesses additional constitutional authority to restrict conduct on the high seas, including the Piracies Clause, U.S. Const., Art. I, §8, cl. 10; the Felonies Clause, id.; and the admiralty power, United States v. Flores, 289 U.S. 137, 148-49, 53 S.Ct. 580, 582, 77 L.Ed. 1086 (1933). And we have always upheld extraterritorial convictions under our drug trafficking laws as an exercise of power under the Felonies Clause. *See* Estupinan, 453 F.3d at 1339 ("[W]e readily hold that the district court committed no error in failing to *sua sponte* rule that Congress exceeded its authority under the Piracies and Felonies Clause in enacting the [Maritime Drug Law Enforcement Act]."). But we have never held that Congress has the power, under the Offences Clause, to apply our drug trafficking laws to conduct in the territorial waters of another State.

United States v. Bellaizac-Hurtado, 700 F.3d 1245, 1257 (11th Cir. 2012). In the instant case, United States drug trafficking laws were not applied to conduct solely in the territorial waters of another State.

conviction and sentence in that all three claims which are based upon *Bellaizac-Hurtado* are meritless.[9]

## VI. Certificate of Appealability

As amended effective December 1, 2009, §2255 Rule 11(a) provides that "[t]he district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant," and if a certificate is issued "the court must state the specific issue or issues that satisfy the showing required by 28 U.S.C. §2253(c)(2)." A timely notice of appeal must still be filed, even if the court issues a certificate of appealability. Rules Governing §2255 Proceedings, Rule 11(b), 28 U.S.C. foll. §2255.

After review of the record, Movant is not entitled to a certificate of appealability. "A certificate of appealablilty may issue ... only if the applicant has made a substantial showing of the denial of a constitutional right." Id. 28 U.S.C. §2253(c)(2). To merit a certificate of appealability, Movant must show that reasonable jurists would find debatable both (1) the merits of the underlying claims and (2) the procedural issues he seeks to raise. Slack v. McDaniel, 529 U.S. 473, 478, 120 S.Ct. 1595, 146 L.Ed.2d 542 (2000). See also Eagle v. Linahan, 279 F.3d 926, 935 (11th Cir. 2001). Because the claims raised are clearly without merit, Movant cannot satisfy the *Slack* test. Slack, 529 U.S. at 484.

---

[9]Even if this Court were to find counsel's performance deficient for failing to seek dismissal of the Indictment and/or the constitutionality of Movant's conviction on the same or similar grounds presented in *Bellaizac-Hurtado*, Movant cannot satisfy the prejudice prong of *Strickland*, because the underlying claim is meritless for the reasons stated herein. See Strickland v. Washington, 466 U.S. 668, 687, 694, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984)(holding that to prevail on a claim of ineffective assistance of counsel, a habeas petitioner must demonstrate both (1) that her or his counsel's performance was deficient, and (2) a reasonable probability that the deficient performance prejudiced the defense).

As now provided by Rules Governing §2255 Proceedings, Rule 11(a), 28 U.S.C. foll. §2255: "Before entering the final order, the court may direct the parties to submit arguments on whether a certificate should issue." If there is an objection to this recommendation by either party, that party may bring this argument to the attention of the district judge in the objections permitted to this report and recommendation.

## VII. Conclusion

Based upon the foregoing, it is recommended that this motion to vacate be DENIED, and no certificate of appealability should issue.

Objections to this report may be filed with the District Judge within fourteen days of receipt of a copy of the report.

Signed this 24th day of June, 2013.

_____
UNITED STATES MAGISTRATE JUDGE


cc:   Juan Gonzalez Castaneda, Pro Se
      Reg.No. 97615-004
      Miami-FCI
      Federal Correctional Institution
      P.O. Box 779800
      Miami, Florida 33177

      Dustin M. Davis, AUSA
      U.S. Attorney's Office
      99 N.E. 4th Street
      Miami, FL 33132